**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| ELIOT FRANKEBERGER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARIETIS HEALTH, LLC.<br><br>Defendant. | Case No. 2:23-cv-875<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT FOR**
**MONETARY AND INJUNCTIVE RELIEF**

Plaintiff Eliot Frankeberger ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "the Class" or "Class Members"), complain of Defendant Arietis Health, LLC ("Arietis" or "Defendant"), as follows, from personal knowledge as to Plaintiff himself and on information and belief based on his counsel's reasonable and diligent investigation as to all other matters. Because Defendant has exclusive knowledge of what information was compromised, Plaintiff reserves the right to supplement these allegations with additional plaintiffs, facts, and injuries as they are discovered.

## I. NATURE OF THE ACTION

1. Defendant Arietis Health, LLC ("Arietis" or "Defendant") describes itself as an industry leader in providing "revenue cycle management" ("RCM")

services for healthcare providers.[1] RCM is the process by which healthcare providers throughout the United States track the medical services they provide to their patients and the associated revenue those services generate.[2] RCM is an essential aspect of healthcare operations and profitability. The goal of RCM service providers (like Defendant Arietis) is to maximize revenue to the healthcare providers they serve by, for example, itemizing and categorizing the services and treatments patients receive (referred to as "coding"), and preparing and submitting that information to health insurance carriers in a manner that leads to payment of claims.[3]

2. RCM necessarily requires the collection, storage, and transfer of large amounts of sensitive and personal patient data for which patients have a high expectation of privacy. This data includes personally identifying information such as full name, social security number, date of birth, phone number, marital status, gender, emergency contact information, and health insurance provider. Furthermore, the data collected and maintained through the RCM process includes patients' private medical information, such as any medical treatments they receive and the reasons for those treatments.[4] This information is integral to health insurance carriers in assessing submitted claims.

---

[1] *See, e.g.*, https://www.arietishealth.com/company/about/ (last visited October 10, 2023).
[2] See generally https://en.wikipedia.org/wiki/Revenue_cycle_management (last visited October 10, 2023).
[3] *Id.*
[4] *Id.*

3. Due to the large volume of private patient information that RCM providers routinely handle, RCM is subject to various legal and regulatory compliance requirements. For instance, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act") both regulate RCM processes and govern the standards for using, disclosing, securing, and transferring patient personal and medical information.

4. Because RCM requires significant expertise (and because, as in any other business, tracking billing and ensuring payment is of central importance to any healthcare provider), many healthcare providers outsource all or part of the RCM process to specialized vendors such as Defendant. And the RCM industry is booming. In 2020, the RCM industry was valued at $260 *billion*, with continued strong growth anticipated over the next decade as more healthcare providers digitize their records and seek more efficient billing and recordkeeping processes.[5]

5. Plaintiff makes this Complaint because Defendant Arietis is responsible for safeguarding the personal and medical information Plaintiff and Class Members entrusted to their medical providers who used Arietis for RCM services in accord with state and federal law, but Arietis negligently failed in its duty to safeguard that personal information. As a result, due to unaddressed security flaws in software

[5] *Id.*

relied upon by Arietis to transfer confidential patient files (an application called "MOVEit"), the private and confidential information *of every single patient* whose healthcare providers use Arietis for RCM and billing services has been accessed by unauthorized and malevolent users. Moreover, once Arietis was informed of the security incident, they waited nearly four full months before informing any of the thousands of impacted patients.

**A. <u>The MOVEit HACK</u>**

6. Defendant Arietis uses a file and data transfer software application called MOVEit to transfer large patient records electronically. *See* September 29, 2023 letter from Defendant to Plaintiff ("Notice of Security Incident"), attached hereto as Exhibit A.

7. According to Defendant, it was notified on May 31, 2023 by Progress Software, creator of MOVEit, that there was a critical vulnerability in MOVEit that required immediate countermeasures. Defendant claims it undertook those countermeasures. *Id.* However, nearly two months later, on July 26, 2023, Arietis determined that unauthorized actors had in fact gained access to Arietis' files in May 2023 and may have acquired private patient information. *Id.*

8. But then, despite taking nearly two months to confirm that its files had been compromised, it took *another* two months, until September 29, 2023, for Arietis finally to report the data breach to the impacted patients (*see* Exhibit A) and

to confirm that the stolen information may have included Plaintiff's "name, date of birth, medical record number, patient account number, health insurance information, diagnosis and treatment information, [and] provider name." *Id.*

9. Plaintiff and Class Members entrusted any payment provider with which their medical practices dealt to maintain the confidentiality of their personal and medical information . As a result of Defendant's failure to protect the private personal and medical information it was entrusted to safeguard, Plaintiff and Class Members suffered a loss of the value of their personal information, and have been exposed to or are at imminent and significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future.

10. Defendant's intentional, willful, reckless, unfair, and negligent conduct harmed Plaintiff and Class Members uniformly. For this reason, Defendant should pay for monetary damages and appropriate identity theft protection services, as well as reimburse Plaintiff and Class Members for the costs caused by Defendant's substandard security practices and failure to timely disclose the same. Plaintiff is likewise entitled to injunctive and other equitable relief that safeguards their information, requires Defendant to improve its data security significantly, and provides independent, expert oversight of Defendant's security systems.

11. Defendant has also been unfairly and unjustly enriched because of its improper conduct, such that it would be inequitable for it to retain the benefits conferred upon it by Plaintiff and the Class Members.

## II. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 Class Members, and minimal diversity exists as Defendant is a citizen of Florida and at least one Class Member is a citizen of a different state.[6]

13. This Court has personal jurisdiction over Defendant because it is an LLC that maintains its principal place of business in this District.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because Defendant's principal place of business is within this District and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District.

---

[6] One client of Defendant is NorthStar Anesthesia. See, e.g., https://www.bankinfosecurity.com/northstararietis-breach-a-23221 (last visited Oct. 11, 2023). NorthStar Anesthesia itself manages 55 healthcare practices across more than 20 states. *Id.* Among the 55 practices is Orange City Anesthesia Services, LLC, from whom Plaintiff has received medical treatment.

## III. NAMED PLAINTIFF

### A. ELIOT FRANKEBERGER

15. Plaintiff Eliot Frankeberger is a natural person residing in Deland, Florida. He is a citizen of Florida.

16. Plaintiff Frankeberger received medical care through Orange City Anesthesia Services, LLC, located in Orange City, FL. Orange City Anesthesia Services, LLC is one of 55 facilities managed by NorthStar Anesthesia, a Texas-based company, which uses Defendant Arietis for RCM services at each of its facilities.[7]

17. On September 29, 2023, Mr. Frankeberger received the "Notice of Security Incident" letter attached as Exhibit A, informing him that his personal information was potentially accessed by authorized users. Although not mentioned in the September 29, 2023, letter, the ransomware hacker group "C10p" claimed responsibility in June 2023 for the MOVEit platform attack.[8] Moreover, also not included in the letter, is that C10p also threatened to sell the data they had stolen if they were not paid a ransom.[9]

---

[7] *Id.*

[8] *See, e.g.,* https://www.bleepingcomputer.com/news/security/clop-now-leaks-data-stolen-in-moveit-attacks-on-clearweb-sites/ (last visited Oct. 11, 2023).

[9] *See, e.g.,* https://www.emsisoft.com/en/blog/44123/unpacking-the-moveit-breach-statistics-and-analysis/ (last visited Oct. 11, 2023).

18. Plaintiff Frankeberger has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of his personal information because that information was accessed and exfiltrated by known hackers. This injury was exacerbated by Defendant's months-long delay in revealing the data breach.

19. Plaintiff Frankeberger has a continuing interest in ensuring that his personal and medical information, which remains with Defendant, is protected and safeguarded from future breaches.

## IV. DEFENDANT

20. Defendant Arietis Health, LLC is a limited liability company with its principal place of business in Ft. Myers, Florida.

## V. FACTUAL ALLEGATIONS

### A. DEFENDANT'S COLLECTION OF PERSONAL INFORMATION

21. Founded in 2020, Arietis provides billing and RCM services to all sectors of the healthcare industry.[10] According to their website, they code nearly 2 million charts annually.

22. As part of its provision of billing and RCM services, Arietis collects huge amounts of data from patients, including personal details (such as names,

[10] *See, e.g.*, https://www.arietishealth.com/solutions/rcm-solutions/ (last visited Oct. 11, 2023).

addresses, telephone numbers, Social Security numbers, and policy numbers), details of diagnosis and treatment, and details of claims made and bills received.

23. As described in Notice of Security Incident (Exhibit A), Arietis uses MOVEit Software "to securely transfer data." As further described in the Notice, Plaintiff and the Class' data that was compromised in the hack included their "name, date of birth, medical record number, patient account number, health insurance information, diagnosis and treatment information, [and] provider name." *Id.*

### B. DEFENDANT'S REPRESENTATIONS ABOUT ITS ABILITY TO SECURE MEMBERS' PERSONAL INFORMATION

24. On its website, Arietis touts it is "committed to being your trusted healthcare partner. We take extreme measures to provide you with highest quality compliance, data security, and revenue integrity."[11] The same webpage features icons indicating "HIPAA Compliant - 100% compliance with Annual HIPPA training" (sic) and "OIG Compliance Program Guidelines Implemented."

### C. THE DATA BREACH

25. As described above, Progress Software, creator of the MOVEit data transfer application, informed Defendant on May 31, 2023 of a potential vulnerability. In July, Defendant confirmed that its files had been penetrated and

[11] *See* https://www.arietishealth.com/company/about/ (last visited Oct. 11, 2023)

accessed by unauthorized uses. Finally, on September 29, 2023, Defendant informed impacted patients of the breach.

26. However, the infiltration into Defendant's systems occurred as early as May 27, 2023, by known ransomware gang "C10p." Due to Defendant's deficient security controls, the hackers were permitted to roam at large throughout Defendant's system for approximately four days, unimpeded and entirely without Defendant's knowledge.

27. The "C10p" hacking group is a well-known cybersecurity threat.[12]

28. Following notice of the data security incident, Defendant claims to have taken "immediate steps to secure and patch its MOVEit server," and claims to have "engaged leading, independent cybersecurity experts to conduct a comprehensive investigation. *See* Ex. A.[13] However, as already noted, whatever efforts Defendant took were far too little, far too late; the C10p hacking gang had already taken everything they wanted and has threatened to sell it to unscrupulous parties.

**D. <u>DEFENDANT'S NOTICE WAS DEFICIENT</u>**

29. Defendant's Notice (Ex. A) concerning the Data Breach is deficient in its content and its timing.

---

[12] *See* https://www.emsisoft.com/en/blog/44123/unpacking-the-moveit-breach-statistics-and-analysis/ (last visited Oct, 11, 2023)

[13] *Id.*

30. The Notice does not provide critical information. It does not disclose how C10p hackers were able to get inside Arietis's systems without detection, and how they were able to exfiltrate vast amounts of data without detection. Critically, the Notices does not even disclose that the hackers had demanded ransom for the return of the data or else it would be further compromised.

31. Defendant's Notice supplies only broad categories of the kinds of information taken rather than explaining precisely what personal information was stolen.[14]

32. Defendant's notices also fail to explain the extent to which the unauthorized attackers were able to compromise its systems, stating vaguely that "unauthorized actors...may have acquired certain files which contain your data."

33. Defendant was required by federal law to provide prompt notice of the Data Breach, and in any event to give notice no later than 60 calendar days after its discovery. If, as Arietis has represented, it detected the breach on July 26, 2023 (despite being told of the breach on May 31, 2023), its September 9, 2023, notice came far too late. Arietis does not even attempt to explain the more than eight-week delay.

---

[14] *Id.*

34. Indeed, Plaintiff Frankeberger and other Class Members did not receive notification of the Data Breach until *September 29*, making it *four months* before they could even begin to take steps to mitigate the harm caused by the breach.

35. Thus Plaintiff and Class Members are left to their own devices in trying to understand what happened with their personal information, what risks they face, and the period during which their personal information was improperly taken.

### E. DEFENDANT FAILED TO SAFEGUARD PERSONAL AND MEDICAL INFORMATION

36. Defendant failed to exercise reasonable care in protecting patient information.

37. Defendant has a nondelegable duty under federal law to ensure that all information it collects and stores is secure, and that any associated entities with whom it shares information maintain adequate and commercially reasonable data security practices to ensure the protection of personal information.

38. More specifically, Defendant knows that healthcare providers and their patients must trust that it is keeping patients' health information private and secure. If they lost trust in Defendant or knew they insecurely store, safeguard, or transmit its patients' personal information, then they could choose a different provider for the services Defendant offers.

39. Defendant is an entity covered by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), *see* 45 C.F.R. § 160.102, and as such is

required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

40. These rules establish national standards for the protection of patient information, including "protected health information," defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. *See* 45 C.F.R. § 160.103.

41. HIPAA limits the permissible uses of "protected health information," prohibits unauthorized disclosures of "protected health information," and requires that Defendant implement appropriate safeguards for this information.

42. HIPAA requires that Defendant provide notice of a breach of unsecured protected health information—which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons (i.e., unencrypted data)—without unreasonable delay. *See* 45 C.F.R. Part 164, Subpart D ("Notification in the Case of Breach of Unsecured Protected Health Information").

"[I]n no case" shall the notice be delivered "later than 60 calendar days after discovery of a breach." 45 C.F.R. § 164.404(b).

43. Notably, to assist a covered entity like Defendant in complying with its data security and privacy obligations, the U.S. Department of Health and Human Services (HHS) "has developed guidance and tools to assist ... in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards ... ."[15]

44. Despite these requirements, the ample guidance HHS supplies for meeting them, and Defendant's representations, Defendant failed to implement appropriate safeguards for its clients' patients' private medical information and failed to provide a clear and timely notice of the threat to patients' information.

45. Specifically, despite its statement that Defendant became aware of the data hack on May 31, 2023, no notice was given to its members until September 29, 2023, an unreasonable delay, and in any event after the 60-day deadline established by HHS.

46. Moreover, Arietis failed to notify its clients' patients that hackers had attempted to ransom their personal information and threatened to publicly release the personal information.

---

[15] *See* https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last accessed July 14, 2023).

47. Defendant violated HIPAA by failing to:

a. maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. adequately protect Plaintiff's and Class Members' personal information;

c. ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d. implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e. implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g. protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules

regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3); and

h. ensure compliance with the electronically protected health information security standard rules by their workforces, in violation of 45 C.F.R. § 164.306(a)(4).

48. In addition to the HHS guidance discussed above, other federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission (FTC) has issued numerous guides for businesses highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[16]

49. The FTC's *Protecting Personal Information: A Guide for Business* sets forth fundamental data security principles and practices for businesses to implement and follow to protect sensitive data. Among other things, it notes that businesses should: (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC

[16] *See* FTC, *Start With Security: A Guide for Businesses*, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed July 14, 2023).

guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large volumes of data being transmitted from their system, and have a response plan ready in the event of a breach.[17]

50. Additionally, the FTC recommends that organizations limit access to sensitive data, require the use of complex passwords on networks, employ industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[18]

51. The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[19]

52. Defendant was fully aware of [its] obligations to implement and use reasonable measures to protect the personal information of Plaintiff and Class

---

[17] *Id.*
[18] *Id.*
[19] FTC, *Privacy and Security Enforcement*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last accessed July 14, 2023).

Members, but failed to comply with these basic recommendations and guidelines that would have prevented the Data Breach from occurring.

### F. PLAINTIFF'S AND CLASS MEMBERS' PERSONAL INFORMATION IS HIGHLY VALUABLE

53. Defendant was or should have been aware that it was collecting highly valuable data, which has increasingly been the target of data breaches in recent years.[20]

54. As early as 2014, the FBI alerted the healthcare industry that it was increasingly a preferred target of hackers, stating "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or Personally Identifiable Information (PII)" so that these companies could take the necessary precautions to thwart such attacks.[21]

55. Further, Cathy Allen, CEO of Shared Assessments, a cyber-risk management group, stated that "just the types of test proscribed might indicate a type of illness that you would not want employers or insurance companies to have.

[20] Healthcare Data Breach Statistics, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last accessed July 14, 2023) ("Our healthcare data breach statistics clearly show there has been an upward trend in data breaches over the past 10 years.").

[21] Jim Finkle, *FBI warns healthcare firms they are targeted by hackers*, REUTERS, Aug. 20, 2014, http://www.reuters.com/article/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820 (last accessed July 14, 2023).

Thieves often steal and resell insurance data on the internet ... having other information makes the data more valuable and the price higher."[22]

56. Personal information is a valuable commodity to identity thieves. Compromised personal information is traded on the "cyber black-market." As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen credit card numbers, Social Security numbers, and other personal information on the dark web, making the information publicly available.[23]

57. Healthcare data is especially valuable on the black market. According to one report, a healthcare data record may be valued at up to $250 per record, compared to $5.40 for the next highest value record (a payment card).[24]

58. According to a *Reuters* investigation that included interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data for sale on the black market "includes names, birth dates, policy numbers, diagnosis codes and billing information."[25] Fraudsters commonly use that

---

[22] *Id.*

[23] *Here's How Much Your Personal Information Is Selling for on the Dark Web,* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed July 14, 2023); McFarland et al., *The Hidden Data Economy*, at 3, https://www.mcafee.com/enterprise/en-us/assets/reports/rp-hidden-data-economy.pdf (last accessed July 14, 2023).

[24] *Hackers, Breaches, and the Value of Healthcare Data* (June 20, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers/ (last accessed July 14, 2023).

[25] Jim Finkle, *Your medical record is worth more to hackers your credit card*, Reuters, https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924 (last accessed July 14, 2023).

data "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[26]

59. According to Tom Kellermann, chief cybersecurity officer of cybersecurity firm Carbon Black, "[h]ealth information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10 personal identifying characteristics of an individual."[27] For this reason, a patient's full medical records can sell for up to $1,000 on the dark web, while credit card numbers and Social Security numbers may cost $5 or less.[28]

60. As noted by Paul Nadrag, a software developer for medical device integration and data technology company Capsule Technologies:

> The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally obtaining prescription medications, filing

[26] *Id.*
[27] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed July 14, 2023).
[28] Paul Nadrag, *Here's How Much Your Personal Information Is Selling for on the Dark Web* (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited July 14, 2023).

> bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans.[29]

**G. DEFENDANT HARMED PLAINTIFF AND CLASS MEMBERS BY ALLOWING ANYONE TO ACCESS THEIR PERSONAL INFORMATION**

61. Defendant knew or should have known both that the personal and medical information they dealt with is incredibly valuable to hackers and that health care data breaches are on the rise. Accordingly, Defendant was on notice for the harms that could ensue if they failed to protect its clients' patients' data.

62. Given the sensitive nature of the personal and medical information stolen in the breach—including Social Security numbers, dates of birth, driver's license numbers, financial account information, health insurance policy numbers, Medicaid or Medicare IDs, and health information, such as treatment and diagnosis information—hackers have the ability to commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and in the indefinite future.

63. Plaintiff and Class Members are imminently threatened with harms as the result of the data breach. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the breach, including purchasing credit

[29] *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web* (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web (last visited July 14, 2023).

protection services, contacting their financial institutions, checking credit reports, and spending time and effort searching for unauthorized activity.

64. The personal information exposed in the data breach is highly coveted and valuable on underground or black markets.

65. Identity thieves can use the stolen information to: (a) create fake credit cards that are used to make purchases as if they were the real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits; (f) file a fraudulent tax return using the victim's information; (g) commit medical and healthcare-related fraud; (h) access financial accounts and records; or (i) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest. Further, loss of private and personal health information can expose the victim to loss of reputation, loss of employment, blackmail, extortion, and other negative effects.

66. While federal law generally limits an individual's liability for fraudulent credit card charges to $50, there are no such protections for a stolen medical identity. According to a 2015 survey on medical identity theft conducted by the Ponemon Institute, victims of medical identity theft spent an average of $13,500

in out-of-pocket costs to resolve the crime.[30] Frequently, this information was used to obtain medical services or treatments (59%), obtain prescription drugs (56%), or receive Medicare and Medicaid benefits (52%).

67. According to the Ponemon study, "[t]hose who have resolved the crime spent, on average, more than 200 hours on such activities as working with their insurer or healthcare provider to make sure their personal medical credentials are secured and can no longer be used by an imposter and verifying their personal health information, medical invoices and claims and electronic health records are accurate."[31]

68. Additionally, the study found that medical identity theft can have a negative impact on reputation as 45% of respondents said that medical identity theft affected their reputation mainly because of embarrassment due to disclosure of sensitive personal health conditions, with 19% responding that they missed out on employment opportunities as a result.[32]

69. Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[33] In some cases, victims may not

[30] *Ponemon Institute, Fifth Annual Study on Medical Identity Theft*, https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 (last accessed July 14, 2023).
[31] *Id.* at 2.
[32] *Id.* at 14.
[33] *Id.* at 1.

even be able to access medical records using their personal information because they include a false name or data points taken from another person's records. Consequently, only 10% of medical identity theft victims responded that they "achiev[ed] a completely satisfactory conclusion of the incident."[34]

70. Moreover, it can take months or years for victims to even discover they are the victim of medical-related identity theft or fraud given the difficulties associated with accessing medical records and healthcare statements. For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;
- Get contacted by a debt collector about medical debt they do not owe;
- See medical collection notices on their credit report that they do not recognize;
- Find erroneous listings of office visits or treatments on their explanation of benefits;
- Receive information from their health plan that they have reached their limit on benefits; or
- Are denied insurance because their medical records show a condition they do not have.[35]

---

[34] *Id.*

[35] *FTC*, *Medical Identity Theft FAQs for Health Care Providers and Health Plans*, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last accessed July 14, 2023).

71. Other types of medical fraud include "leveraging details specific to a disease or terminal illness, and long-term identity theft."[36] According to Tom Kellermann, "[t]raditional criminals understand the power of coercion and extortion. By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[37] Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

72. As explained further by the FTC, medical identity theft can have other serious consequences:

> Medical ID thieves may use your identity to get treatment – even surgery – or to bilk insurers by making fake claims. Repairing damage to your good name and credit record can be difficult enough, but medical ID theft can have other serious consequences. If a scammer gets treatment in your name, that person's health problems could become a part of your medical record. It could affect your ability to get medical care and insurance benefits, and could even affect decisions made by doctors treating you later on. The scammer's unpaid medical debts also could end up on your credit report.[38]

---

[36] Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed July 14, 2023).

[37] *Id.*

[38] *Medical ID Theft: Health Information for Older People*, Federal Trade Commission, https://web.archive.org/web/20201019075254/https://www.consumer.ftc.gov/articles/0326-medical-id-theft-health-information-older-people (last accessed July 14, 2023).

73. According to a 2023 study, the costs incurred by data-breach victims are "real and substantial, and can persist for years after a breach occurs."[39]

74. The authors examined a 2012 breach of tax records from the South Carolina Department of Revenue, which included "Social Security numbers and complete tax returns—information that swindlers could use to open new bank or credit-card accounts or borrow money in victims' names," similar to the Social Security numbers and billing information that was taken in the Data Breach here. A "substantial portion of South Carolina's population" was affected by the breach.[40]

75. The authors found that, controlling for various demographic and economic factors, South Carolina residents faced substantial costs as a likely result of the breach. Mortgage application denials rose by 4 percent in the four years following the breach (compared to 1.6 percent increases in two comparator states, Georgia and North Carolina). Loan amounts rose by $1,095 (compared to $437 in Georgia and North Carolina). Reported incidents of wire fraud rose by 20 percent (compared to 7 percent in all other states). Consumer complaints about credit cards and credit reporting likewise saw larger jumps than in other states.[41]

[39] Min-Seok Pang & Anthony Vance, *Your Personal Data Has Been Stolen. Will It Really Cost You Anything?*, Wall Street Journal (June 6, 2023), https://www.wsj.com/articles/personal-data-stolen-what-cost-you-f0c8e6a1 (last accessed July 14, 2023) (discussing results of Min-Seok Pang & Anthony Vance, *Breached and Denied: The Cost of Data Breaches on Individuals as Mortgage Application Denials* (forthcoming)), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4451577 (last accessed July 14, 2023).

[40] *Id.*

[41] *Id.*

76. As the result of the wide variety of injuries that can be traced to the data breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. losing the inherent value of their personal information;

b. identity theft and fraud resulting from the theft of their personal information;

c. costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

d. costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

e. unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

f. lowered credit scores resulting from credit inquiries following fraudulent activities;

g. costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the data breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts; and

h. the continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their personal information being in the possession of one or many unauthorized third parties.

77. Plaintiff and Class Members place significant value in data security. According to a recent survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[42]

78. Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, Defendant would have no reason to tout its data security efforts to their public and private clients.

## **CLASS ALLEGATIONS**

### **I. CLASS DEFINITIONS**

79. Plaintiff reserves the right to modify or amend the definitions below before the Court determines whether certification is appropriate.

[42] FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 2016), https://www2.fireeye.com/rs/848-DID-242/images/rpt-beyond-bottomline.pdf (last visited July 14, 2023).

### A. NATIONWIDE CLASS

80. Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of the following nationwide class (the "Nationwide Class" or the "Class"):

> All natural persons residing in the United States whose personal information was compromised in the data security incident reported by Defendant on September 29, 2023.

81. The Nationwide Class asserts claims against Defendant for negligence (Count 1), negligence *per se* (Count 2), and breach of third party beneficiary contract (Count 3).

### B. EXCLUSIONS

82. Excluded from each Class and Subclass definitions above are Defendant, any entity in which Defendant has a controlling interest, and any of Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class and Subclasses are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

## II. THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23

83. **Numerosity. Federal Rule of Civil Procedure 23(a)(1)**. The members of the Class are so numerous and geographically dispersed that individual joinder of

all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, those individuals' names and addresses are available from Defendant's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods. Joinder of all Class Members is impracticable.

84. **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a. Whether Defendant had a duty to protect personal information;

b. Whether Defendant failed to take reasonable and prudent security measures;

c. Whether Defendant was negligent in failing to implement reasonable and adequate security procedures and practices;

d. Whether Defendant's security measures to protect its systems were reasonable in light known legal requirements;

e. Whether Defendant's efforts (or lack thereof) to ensure the security of its members' personal information were reasonable in light of known legal requirements;

f. Whether Defendant's conduct constituted unfair or deceptive trade practices;

g. Whether Defendant violated state law when it failed to implement reasonable security procedures and practices;

h. Which security procedures and notification procedures Defendant should be required to implement;

i. Whether Defendant violated state consumer protection and data breach statutes in connection with the actions described herein;

j. Whether Defendant failed to notify Plaintiff and Class Members as soon as practicable and without delay after the data breach was discovered;

k. Whether Defendant breached an implied term of its agreement with Plaintiff and Class Members by failing to implement reasonable security procedures and practices;

l. Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the data breach and/or the loss of the personal information of Plaintiff and Class Members;

m. Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Defendant's failure to reasonably protect their personal information; and

n. Whether Plaintiff and Class Members are entitled to damages or injunctive relief.

85. **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of other Class Members. Plaintiff's personal information was in Defendant's possession at the time of the data breach and was compromised as a result of the data breach. Plaintiff' damages and injuries are akin to other Class Members and Plaintiff seeks relief consistent with the relief of the Class.

86. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representatives of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

87. **Predominance & Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because those issues discussed in

the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

88. **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for Defendant or would be dispositive of the interests of members of the Class.

89. **Ascertainability.** The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits

within them. The Class consists of individuals whose information was supplied to Defendant. Class membership can be determined using Defendant's records—presumably also how Defendant was able to provide notice of breach letters to Class Members.

90. **Injunctive Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive relief appropriate to the Class as a whole. Injunctive relief is necessary to uniformly protect Class Members' data. Plaintiff seeks prospective injunctive relief as a wholly separate remedy from any monetary relief.

91. **Issues Class.** Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their personal information;

b. Whether Defendant failed to take commercially reasonable steps to safeguard the personal information of Plaintiff and the Class Members;

c. Whether Defendant was unfairly and unjustly enriched as a result of its improper conduct, such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the other Class Members; and

d. Whether adherence to HIPAA regulations, FTC data security recommendations, industry standards, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On behalf of Plaintiff and all Class Members)

92. Plaintiff repeats and reallege the allegations contained in paragraphs 1–91 as if fully set forth herein.

93. Defendant required Plaintiff and Class Members' personal information to provide billing and RCM service. Defendant collected and stored the personal information for commercial gain.

94. Defendant knew or should have known that its systems were vulnerable to unauthorized access and exfiltration by third parties.

95. Defendant had a non-delegable duty to maintain adequate and commercially reasonable data security practices to ensure the protection of its clients' patients' personal information.

96. Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' personal information within its control from being compromised, lost, stolen, accessed, or misused by unauthorized persons.

97. Defendant owed a duty of care to Plaintiff and Class Members to provide security, consistent with industry standards, to ensure that the systems and networks Defendant utilized adequately protected their personal information.

98. Defendant's duty to use reasonable security measures arose from the special relationship that arose between Defendant, and Plaintiff and Class Members once they took custody of Plaintiff and Class Members personal and medical data. Only Defendant was in a position to ensure that it had sufficient safeguards to protect against the harm to Plaintiff and Class Members that would result from a data breach.

99. Defendant's duty to use reasonable care in protecting personal information arose from the common law and the statutes and regulations, as well as its own promises regarding privacy and data security to patients. This duty exists because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. By collecting and maintaining the personal and confidential information of Plaintiff and Class Members and acknowledging that this information needed to be kept secure, it was foreseeable that they would be harmed

in the future if Defendant did not protect Plaintiff's and Class Members' personal information from hackers like C10p.

100. Defendant's duties also arose under HIPPA regulations, which, as described above, apply to Defendant and establish national standards for the protection of patient information, including protected health information, which require Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

101. Defendant's duties also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect personal and confidential information. Various FTC publications and data security breach orders further establish Defendant's duty.

102. Defendant knew, or should have known, of the risks inherent in collecting and storing personal information, the vulnerabilities of its systems, and the importance of adequate security.

103. Defendant breached its common law, statutory, and other duties—and thus was negligent—by failing to use reasonable measures to protect its members'

personal information, and by failing to provide timely and adequately detailed notice of the Data Breach.

104. Defendant breached its duties to Plaintiff and Class Members in numerous ways, including by:

a. Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiff's and Class Members' personal information;

b. Failing to comply with industry standard data security standards during the period of the data breach;

c. Failing to comply with regulations protecting the personal information at issue during the period of the data breach;

d. Failing to adequately monitor, evaluate, and ensure the security of its network and systems;

e. Failing to recognize in a timely manner that Plaintiff's and other Class Members' personal information had been compromised; and

f. Failing to timely and adequately disclose that Plaintiff's and Class Members' personal information had been improperly acquired or accessed.

105. Plaintiff's and Class Members' personal information would not have been compromised but for Defendant's wrongful and negligent breach of its duties.

106. Defendant's failure to take proper security measures to protect sensitive personal information of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiff's and Class Members' personal information.

107. It was also foreseeable that Defendant's failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiff and Class Members as described in this Complaint.

108. Neither Plaintiff nor the other Class Members contributed to the data breach and subsequent misuse of their personal information.

109. As a direct and proximate cause of Defendant's conduct, Plaintiff and Class Members suffered damages and will suffer damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the personal information of Plaintiff and Class Members; damages arising from identity theft or fraud; damages from lost time and effort to mitigate the actual and potential impact of the data breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take years to discover and detect; and loss of the value of

their privacy and confidentiality of the stolen confidential data, including health data.

**COUNT II**
**NEGLIGENCE PER SE**
**(On behalf of Plaintiff and all Class Members)**

110. Plaintiff repeats and reallege the allegations contained in paragraphs 1–91 as if fully set forth herein.

111. Defendant is an entity covered by HIPAA, 45 C.F.R. § 160.102, and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

112. HIPAA requires Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

113. HIPAA further requires Defendant to disclose the unauthorized access and theft of the personal information to Plaintiff and Class Members "without unreasonable delay" so that Plaintiff and Class Members can take appropriate

measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their personal information. *See* 45 C.F.R. §§ 164.404, 406, & 410.

114. Defendant violated HIPAA by failing to reasonably protect Plaintiff's and Class Members' personal information, as described herein.

115. Defendant's violations of HIPAA constitute negligence per se.

116. Plaintiff and Class Members are within the class of persons that HIPAA were designed to protect.

117. The harm that occurred due to the data breach is the type of harm against which HIPAA were intended to guard.

118. Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect personal information. 15 U.S.C. § 45(a)(1).

119. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

120. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect personal information and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of personal information it obtained, stored, and disseminated, and the foreseeable consequences of a data breach involving

companies such as Arietis, including, specifically, the immense damages that would result to Plaintiff and Class Members.

121. Defendant's violations of Section 5 of the FTC Act constitute negligence per se.

122. Plaintiff and Class Members are within the class of persons that the FTC Act were intended to protect.

123. The harm that occurred due to the data breach is the type of harm against which the FTC Act were intended to guard. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm Plaintiff and Class Members have suffered.

124. As a direct and proximate result of Defendant's negligence per se, Plaintiff and Class Members have suffered, continue to suffer, and will suffer, injuries, damages, and harm as set forth herein.

## COUNT III
## BREACH OF THIRD PARTY BENEFICIARY CONTRACT
## (On behalf of Plaintiff and all Class Members)

125. Plaintiff repeats and realleges the allegations contained in paragraphs 1–91 as if fully set forth herein.

126. Defendant entered into written contracts with its clients, such as NorthStar Anesthesia. These contracts obligate Defendant to reasonably safeguard

Plaintiff's and Class Members' private health information, among other ways, by implementing reasonable security measures to prevent unauthorized intrusion into and disclosure of Plaintiff's and Class Members' private health information. Plaintiff and the Class are the intended third-party beneficiaries of these contracts.

127. Defendant breached this term of its contracts with its clients by failing to implement reasonable security measures to safeguard Plaintiff and Class Members' information.

128. As a direct and proximate result of Defendant's breach, Plaintiff and Class Members, who are third party beneficiaries of Defendant's contracts, have suffered, continue to suffer, and will suffer injuries, damages, and harm as set forth herein.

**PRAYER FOR RELIEF**

129. Plaintiff asks the Court to enter judgment in his and the Class Members' favor for:

a. permanent declaratory and injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

b. compensatory, consequential, and general damages in an amount to be determined at trial;

c. punitive or exemplary damages, to the extent permitted by law;

d. costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e. pre- and post-judgment interest at the maximum legal rate; and

f. all such other relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

DATED: October 11, 2023

**VARNELL & WARWICK, P.A.**

/s/Janet R. Varnell_
Janet R. Varnell, FBN: 0071072
Brian W. Warwick, FBN: 0605573
400 N Ashley Drive, Suite 1900
Tampa, Florida 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
*bwarwick@vandwlaw.com*
*jvarnell@vandwlaw.com*

**KLAFTER LESSER LLP**
Jeffrey A. Klafter*
Seth R. Lesser*
Christopher Timmel*
Two International Drive, Suite 350
Rye Brook, New York 10573
Telephone: (914) 934-9200
Facsimile: (914) 934-9220
*jak@klafterlesser.com*
*seth@klafterlesser.com*
*christopher.timmel@klafterlesser.com*

**FRANCIS MAILMAN SOUMILAS, P.C.**
James A. Francis*
1600 Market Street
Suite 2510
Philadelphia, PA, 19103
Telephone: (215) 735-8600
Facsimile: (215) 940-8000
*jfrancis@consumerlawfirm.com*

*Pro hac to be filed

***Attorneys for Plaintiff and the Proposed Class***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 11th day of October, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Janet R. Varnell
JANET R. VARNELL